**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>JOHN JOSEPH GRAY a/k/a JACK GRAY,<br><br>Debtor. | Chapter 7<br><br>Case No. 14-11851 (SMB) |
| STILLWATER LIQUIDATING LLC,<br><br>Plaintiff,<br><br>-against-<br><br>JOHN JOSEPH GRAY a/k/a JACK GRAY,<br><br>Defendant. | Adv. Pro. No. 14-02235 (SMB) |

**MEMORANDUM DECISION AND ORDER
DENYING THE DEBTOR A DISCHARGE**

**A P P E A R A N C E S:**

FOLEY & LARDNER LLP
*Attorneys for Plaintiff*
90 Park Avenue
New York, NY 10016-1314

    Katherine R. Catanese, Esq.
        Of Counsel

JOHN JOSEPH GRAY
Defendant *Pro Se*
120 East 34th Street, 9H
New York, NY 10016

**STUART M. BERNSTEIN
United States Bankruptcy Judge:**

    The plaintiff, Stillwater Liquidating LLC ("Stillwater"), filed this adversary proceeding

objecting to the debtor's discharge pursuant to 11 U.S.C. § 727(a)(3) and seeking a

determination of the dischargeability of his debt under 11 U.S.C. § 523(a)(2) and (a)(6). The Court conducted a two-day trial at which the debtor and his wife testified, and the Court received a substantial amount of documentary evidence. At the conclusion of the trial, the Court dismissed the claims under Bankruptcy Code § 523(a), (*see* Transcript of Hrg. Held 11/2/15 ("Tr. (11/2)"), at 99:20-101:21 (ECF Doc. # 37)), and reserved decision on the claim under Bankruptcy Code § 727(a)(3). Having considered the testimony, the documentary evidence and the briefing by the parties, the Court concludes that the debtor is not entitled to a general discharge under Bankruptcy Code § 727.

## BACKGROUND[1]

The debtor, John Joseph Gray, was a partner with Edmund M. Abramson in real estate development projects in Florida in the mid-2000s. In 2006, Stillwater entered into a joint venture with Trinity Quadrille, LLC ("Trinity") to construct a project on real property located in West Palm Beach, Florida. Gray and Abramson were the principals and the sole members of Trinity. (SOF ¶ 1.) On or about December 4, 2006, Trinity borrowed $3 million from Stillwater, evidenced by a promissory note, and Gray and Abramson personally guaranteed the Trinity note. (SOF ¶¶ 2, 4, 7.) Following the default on the note and guarantees, Stillwater sued Trinity, Gray and Abramson in the New York Supreme Court, (SOF ¶¶ 9, 10), and obtained a judgment against all three on October 25, 2011 in the amount of $3,732,876.30. (SOF ¶ 14; PX 22.)

In April 2013, Stillwater commenced judgment enforcement proceedings against Gray. On April 22, 2013, Stillwater served subpoenas requiring Gray to disclose information regarding

---

[1] In this decision, "PX" refers to Stillwater's exhibits (the debtor did not offer any exhibits), "Tr. (10/21)" refers to the trial transcript of October 21, 2015 (ECF Doc. # 36), "Tr. (11/2)" refers to the transcript of November 2, 2015 and "SOF" refers to the stipulation of facts in the Joint Pretrial Order, dated Oct. 21, 2015 (ECF Doc. # 32).

his personal finances, but Gray failed to respond. The state court issued an order of contempt against Gray on June 5, 2013, and ordered him to pay Stillwater $2,500.00 for legal fees. (SOF ¶¶ 15-17.) The Supreme Court also cautioned Gray that the "[f]ailure to appear in subsequent proceedings will result in further punishment." (SOF ¶ 17.)

In the course of the June 5, 2013 hearing, the state court "so ordered" an additional subpoena requesting documents and information regarding Gray's personal finances. (SOF ¶ 18.) Despite various extensions requested by Gray and agreed to by Stillwater, Gray failed to comply and Stillwater sought and obtained a second order of contempt dated December 19, 2013. (SOF ¶¶ 19-22.) At the hearing before the state court, the judge directed Gray to complete the subpoenas and produce the documents by a date certain, but he never complied. (SOF ¶¶ 22-24.) The state court issued a bench warrant, and on June 18, 2014, issued a third order of contempt against Gray. (PX 27.) Two days later, on June 20, 2014, he filed this chapter 7 case. (SOF ¶ 25.)

Gray listed virtually no assets in his bankruptcy schedules. He had no real property, cash on hand, no checking or savings accounts, and no financial accounts of any kind. His personal property consisted of three televisions, five lithographs, and five wrist watches, collectively worth a total of $4,500. (SOF ¶ 26.) Schedule I indicated that he was not employed, but earned gross monthly income of $2,500 of which his monthly take-home pay was $2,000. (SOF ¶ 27.) Adding Gray's wife's contributions, he listed a combined monthly income of $15,060, or approximately $180,720 per year. (SOF ¶ 28.)

In Schedule J, Gray reported total monthly expenses of $13,290. He lives with his wife and their two sons, ages 17 and 14, in Manhattan in a space that costs $6,000 per month. He also

3

listed the children's education costs as $2,000 per month, monthly car payments of $650 and monthly car insurance payments of $110, transportation costs of $140 per month on top of his other car related payments, and a debt to the IRS in the sum of $145,000. His summary of schedules listed $7,333,647.32 in total liabilities. (SOF ¶¶ 29-31.)

His failure to produce documents relating to his financial condition during the pre-petition judgment enforcement proceedings, continued at trial. Gray and his wife have always kept their business affairs separate. (Tr. (10/21) at 46:1-10; 52:20-24.) They maintain separate bank accounts, (Tr. (10/21) at 52:6-8), and file separate tax returns. (Tr. (10/21) at 36:3-17; 52:9-12.) Gray only uses cash; he does not have any credit cards. (Tr. (11/2) at 26:10-13.) He did not have any W-2s, 1099s, or K-1s for the years 2006 to the present, (*see* Tr. (11/2) 22:5-9, 28:5-9; Tr. (10/21) at 156:1-5), but admitted that he earned income through 2011. (Tr. (10/21) at 145:19-147:12.) Moreover, although he testified that he did not earn any income after 2011, (Tr. (10/21) at 147:13-15), he declared in his statement of financial affairs that he earned $50,000 in 2012, $30,000 in 2013 and $15,000 in 2014 as of the petition date, all from self-employed, consulting work. (PX 12 at SWPX000264.) In addition, he represented in Schedule "I" that he was earning gross monthly income of $2,500.

Despite his receipt of income in unknown amounts over the years, he has not filed any income tax returns since 2006. He testified that he had consulted with a tax attorney in 2003 or 2004 who advised him that he did not have to file tax returns, but could not recall the attorney's name and did not have any contact information. (Tr. (11/2) at 22:24-23:14, 57:11-24.) His plan, he revealed at trial, was to file his tax returns as soon as his income and losses were straightened out. (Tr. (11/2) at 22:15-23.)

4

Notwithstanding the relatively modest income that he reported in his statement of financial affairs for 2012 and 2013, Gray has managed to come up with more cash from undisclosed sources. During 2012 and 2013, when he earned no income (if you believe his testimony) or $80,000 in income (if you believe his statement of financial affairs), he transferred approximately $130,000 to his wife. In fact, during 2006 through 2013, he made transfers to his wife aggregating $1,982,350. (*See* PX 13, 14.)[2]

Gray also failed to keep and maintain other records needed to ascertain his financial condition. For example, he produced only nineteen bank statements relating to a Kanon Asset Management LLC ("Kanon") bank account, his principal bank account, for the period 2007 through 2013. (Tr. (10/21) at 157:10-18.) He testified he had lost access to or thrown out the rest, (*see* Tr. (10/21) at 173:1-17), but Stillwater managed to subpoena all of the account records from the bank. In addition, Gray testified that he had no active bank account in 2014, and was unable to explain where he deposited his 2014 income, admitting that "there's an issue there." (Tr. (10/21) at 162:24-164:17.) For that matter, he failed to keep any records of deposits into the Kanon account other than the nineteen statements. (Tr. (11/2) at 7:1-25, 10:5-11:13.) He also failed to keep copies of cancelled checks, (Tr. (11/2) at 31:5-11), or other records of transfers from the Kanon account, and was unable to identify the recipients or purpose of many of the transfers reflected in the Kanon bank statements. (Tr. (11/2) at 29:16-20, 38:9-17.) Nor did he have any records of the loans he received from Herbert Feinberg (totaling $70,000), (Tr. (10/21) at 150:12-25; 180:1-13), Peter Romano (totaling $300,000), (Tr. (11/2) at 14:6-10, 14:22-15:19),

---

[2] PX 13 and 14 consist of voluminous bank statements relating to Kanon's account at Citibank during the relevant period. The information relating to the deposits into and transfers out of the Kanon account is derived from these exhibits. During the trial, Stillwater supplied a chart that summarized this information. The chart was not received into evidence but was used to summarize the relevant information.

5

or Charlene Capotorto, his sister. (Tr. (11/2) at 33:12-15, 35:22-36:5.) The loans from Feinberg and Romano remain outstanding but Gray did not schedule them, explaining that they were personal loans and he only listed business loans. (Tr. (10/21) at 180:14:23.)

## DISCUSSION

The principal purpose of the Bankruptcy Code is to grant a fresh start to "the honest but unfortunate debtor." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934); *accord Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007); *Grogan v. Garner,* 498 U.S. 279, 286-287 (1991). The denial of a debtor's discharge is "an extreme penalty for wrongdoing," *State Bank of India v. Chalasani (In re Chalasani),* 92 F.3d 1300, 1310 (2d Cir. 1996), and the discharge provisions "must be construed strictly against those who object to the debtor's discharge and 'liberally in favor of the bankrupt.'" *Id.* (*quoting Bank of Pa. v. Adlman (In re Adlman),* 541 F.2d 999, 1003 (2d Cir. 1976)); *accord Berger & Assocs. Attorneys, P.C. v. Kran (In re Kran)*, 760 F.3d 206, 210 (2d Cir. 2014). Nevertheless, a bankruptcy discharge is a privilege, not a right, *Christy v. Kowalski (In re Kowalski),* 316 B.R. 596, 600–01 (Bankr. E.D.N.Y. 2004); *Congress Talcott Corp. v. Sicari (In re Sicari)*, 187 B.R. 861, 880 (Bankr. S.D.N.Y. 1994), and will be denied when the individual debtor commits an act that is plainly proscribed by 11 U.S.C. § 727(a). The plaintiff bears the burden of establishing each of the elements of an objection to discharge under § 727 by a preponderance of the evidence. *See Minsky v. Silverstein* (*In re Silverstein*), 151 B.R. 657, 660 (Bankr. E.D.N.Y. 1993); *see also* FED. R. BANKR. P. 4005.

Bankruptcy Code § 727(a)(3) mandates the denial of a discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information . . . from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11

6

U.S.C. § 727(a)(3). The purpose of § 727(a)(3) is "to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs," *D.A.N. Joint Venture v. Cacioli (In re Cacioli),* 463 F.3d 229, 234 (2d Cir. 2006) (quoting *In re Underhill,* 82 F.2d 258, 260 (2d Cir. 1936), *cert. denied,* 299 U.S. 546 (1936)), and ensure that "creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history." *Cacioli*, 463 F.3d at 234 (quoting *Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3d Cir. 1992)). The debtor's financial information need not be perfect; it is enough "that there be available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained." *Kran*, 760 F.3d at 210; *Underhill,* 82 F.2d at 260 (construing a precursor to modern 11 U.S.C. § 727(a)(3)).

Proof of a § 727(a)(3) violation involves a shifting burden. The initial burden of going forward with the evidence rests with the creditor to "show that the debtor failed to keep and preserve any books or records from which the debtor's financial condition or business transactions might be ascertained." *Cacioli*, 463 F.3d at 235. Further, although § 727(a)(3) focuses on records relating to the debtor's personal financial affairs, his failure to keep adequate financial records regarding the business transactions of a closely held corporation that are necessary to determine his personal financial affairs may result in the denial of a discharge. *Beach Lane Mgmt., Inc. v. White* (*In re White*), Adv. P. No. 13-01108 (SMB), 2015 WL 9274771, at *3 (Bankr. S.D.N.Y. Dec. 18, 2015) (collecting cases). The plaintiff is not required to establish that the debtor intended to conceal or destroy financial information. *State Bank of India v. Sethi (In re Sethi),* 250 B.R. 831, 837 (Bankr. E.D.N.Y. 2000).

The adequacy of the debtor's books and records depends on the number, complexity and size of the transactions in which he has engaged. *Underhill*, 82 F.2d at 259-60; *see Office of the*

7

*Comptroller General of the Republic of Bolivia v. Tractman*, 107 B.R. 24, 26 (S.D.N.Y. 1989) (stating that the standard for record keeping established in *Underhill* remains good law under the Bankruptcy Code). "[T]he debtor is not required to keep an impeccable system of bookkeeping or records so complete that he can satisfy an expert in business," but is required to produce sufficient records from which the court and the creditors can gain an accurate and complete picture of his finances. *Sethi*, 250 B.R. at 838. The failure to produce records during discovery raises the inference that the debtor has failed to maintain appropriate records, but the inference may be rebutted by the subsequent production of the records. *Schackner v. Breslin Realty Dev. Corp.*, No. 11-CV-2734 (JS), 2012 WL 32624, at *5 (E.D.N.Y. Jan. 5, 2012); *Helms v. Gangemi* (*In re Gangemi*), 291 B.R. 242, 246 (E.D.N.Y. 2003); *Beach Lane*, 2015 WL 9274771, at *4 n. 7.

Once the plaintiff shows the absence or the inadequacy of the debtor's records, the burden of going forward shifts to the debtor to justify his failure to preserve or keep them. *Cacioli*, 463 F.3d at 235; *Nisselson v. Wolfson* (*In re Wolfson*), 139 B.R. 279, 286-87 (Bankr. S.D.N.Y. 1992), *aff'd*, 152 B.R. 830 (S.D.N.Y. 1993). The sufficiency of the debtor's justification is "a question in each instance of reasonableness in the particular circumstances." *Cacioli*, 463 F.3d at 235 (quoting *Underhill*, 82 F.2d at 259–60); *accord Meridian Bank*, 958 F.2d at 1231 (stating that "[t]he issue of justification depends largely on what a normal, reasonable person would do under similar circumstances" (quoting *In re Wilson*, 33 B.R. 689, 692 (Bankr. M.D. Ga. 1983))). The court may consider a variety of factors including "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and

8

any other circumstances that should be considered in the interest of justice." *Cacioli*, 463 F.3d at 237 (quoting *Meridian Bank*, 958 F.2d at 1231);[3] *accord Sethi*, 250 B.R. at 839.

Here, Stillwater carried its initial burden of demonstrating that Gray failed to keep or preserve recorded information from which his financial condition or affairs might be ascertained. Indeed, it is difficult to imagine a more blatant example of such failure. The state court entered three contempt orders based upon Gray's failure to produce financial information, giving rise to the inference that he did not maintain appropriate records. Gray failed to rebut the inference, and in fact, failed to produce any financial records during this case except for nineteen bank statements spread out over several years. He did not produce any information relating to the sources or amounts of his income, including income in recent years, he did not provide any W-2s, 1099s or K-1s, he had no records (aside from the nineteen statements) of the transfers into and out of the Kanon account by check or otherwise, he could not explain what he did with the income he received in 2014 after the Kanon account was closed, he had no records explaining the discrepancies between the income he reported in his statement of financial affairs during 2012 and 2013 and the greater sums he transferred to his wife during that same period, and he did not have any documentation relating to at least two outstanding personal loans that he omitted from his schedules because he only listed his business debts.

In addition, Gray has not filed any income tax returns since 2006. "Income tax returns are quintessential documents 'from which the debtor's financial condition or business transactions might be ascertained,' in the words of subsection (3)." *Nisselson v. Wolfson* (*In re*

---

[3] Some courts have incorrectly applied the same standards to determine the *adequacy* of the debtor's books and records; these factors are applied in deciding whether the debtor has justified his failure to keep books and records and not their adequacy. *Cacioli*, 463 F.2d at 236.

9

*Wolfson*), 152 B.R. 830, 833 (S.D.N.Y. 1993).[4] Although the failure to file tax returns, standing alone, may be insufficient to bar a discharge under Bankruptcy Code § 727(a)(3), *McDow v. Korfonta* (*In re Korfonta*), No. 09-1228, 2009 WL 4571852, at *3 (Bankr. E.D. Va. Dec. 2, 2009); *Wachovia Bank, N.A. v. Spitko* (*In re Spitko*), 357 B.R. 272, 310 (Bankr. E.D. Pa. 2006), the persistent "failure to file timely tax returns—especially for several years in a row—is a blatant example of a failure to maintain adequate records." *Pher Partners v. Womble* (*In re Womble*), 289 B.R. 836, 858 (Bankr. N.D. Tex. 2003), *aff'd*, 299 B.R. 810 (N.D. Tex. 2003), *aff'd*, 108 F. App'x 993 (5th Cir. 2004); *accord Jou v. Adalian* (*In re Adalian*), 500 B.R. 402, 407-08 (Bankr. M.D. Pa. 2013); *Peters v. Michael* (*In re Michael*), 433 B.R. 214, 223 (Bankr. N.D. Ohio 2010); *see Korfonta*, 2009 WL 4571852, at *4 ("[G]iven the legal requirement to prepare and file returns, the failure to do so reasonably supports an inference that the debtor has not kept or preserved the financial records that would enable a return to be prepared.").

Stillwater having carried its initial burden, the burden of going forward shifted to Gray to justify his failure to record or preserve the records pertaining to his financial condition. *Wolfson*, 139 B.R. at 286. His justifications fell between the unbelievable and the incredible. For example, he testified that he did not have any of his earlier business or personal financial records – paper or electronic – because they were lost when Stillwater and Trinity were evicted from their offices. (Tr. (10/21) at 154:16-155:8; Tr. (11/2) at 56:16-57:6.) The eviction occurred in 2010. (Tr. (11/2) at 64:20-65:9.) Coincidentally, the records relating to one of Gray's

---

[4]    The District Court's opinion *Wolfson* is sometimes cited for the proposition that the failure to file tax returns is a ground for denying the discharge under Bankruptcy Code § 727(a)(3). In *Wolfson*, the trustee asked for tax returns for the years 1983-1989. The debtor first stated that the production would be delayed because he was moving offices, and eventually produced tax returns that had not been prepared until after the trustee had demanded them. The District Court observed: "it is fair to say that an aroma of fraud surrounds Wolfson's failure to keep, preserve, or previously produce the promised tax returns." *Wolfson*, 152 B.R. at 833. The District Court did not, however, conclude that the mere failure to file tax returns, without more, was enough to bar the discharge.

businesses, Fresh Harvest River, were also lost around the same time as the result of a wholly unrelated eviction by First Commonwealth Bank. (Tr. (11/2) at 19:19-20:6.) Even if these "dog ate my homework" excuses were credited, they do not explain why Gray did not have any personal or business records for 2011, 2012, 2013 or 2014.

He tried to justify his failure to produce his Kanon bank statements claiming he lacked the money to pay the bank to copy them. (Tr. (11/2) at 63:13-23.) This tries to excuse a later failure with an earlier one. Gray was under a duty to take reasonable steps to retain records from which his financial condition may be ascertained, including bank statements and cancelled checks. *Beach Lane*, 2015 WL 9274771, at *10 (collecting cases). Had he retained the Kanon statements when he received them, he would not have had to pay the bank to supply them a second time.

Moreover, his cry of poverty rings hollow since he never produced any records of his income or expenses. In addition, he was able to accumulate more money than he reportedly earned in 2012 and 2013 to transfer to his wife. Furthermore, he did not provide any cost estimate implying he never even asked the bank how much it would cost. His failure to make any effort to obtain copies of bank records that he should have kept in the first place is symptomatic of his cavalier attitude toward keeping and preserving records relating to his financial condition.

His reasons for not filing personal tax returns were also unconvincing. He testified that a tax lawyer told him in 2003 or 2004 that he did not have to file tax returns because his losses from two real estate projects between 1998 and 2002 resulted in negative income. (Tr. (11/2) at 23:8-11, 54:23-55:4.) He could not identify the lawyer, and had not consulted a tax lawyer since

then. Many years have passed since he realized those losses, and it defies belief that a businessman like Gray would think he still did not have to file tax returns.

Moreover, given Gray's level of sophistication, he cannot justify his record keeping failures. *Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R. 429, 436 (S.D.N.Y. 2004) (denying discharge and holding that "[w]hen a debtor is engaged in business, he has a duty to maintain records in a manner consistent with what is normally expected of businesses of the same complexity"); *Capital Bus. Credit LLC v. Sharma (In re Sharma)*, No. 12-14472 (SCC), 2014 WL 5714494, at *8 (Bankr. S.D.N.Y. Nov. 4, 2014) ("A sophisticated debtor is generally held to a higher level of accountability in record keeping, and the more complex the debtor's financial situation, the more numerous and detailed the debtor's financial records should be."). He received a Bachelor's degree from Seton Hall University and took classes at NYU. (Tr. (10/21) at 75:18-76:11.) He was a principal in a variety of businesses, including Trinity, (Tr. (10/21) at 76:12-77:20; 80:13-81:3; 82:2-21), and more recently, served as a freelance consultant. Trinity developed real estate projects in Florida before the 2008 market crash, and Gray was responsible for overseeing the design, entitlement, marketing and construction of the projects. (Tr. (11/2) at 52:21-25.) He surely had to understand the importance of financial recordkeeping in marketing real estate and funding construction.

Gray's credibility was also undercut by character evidence pertaining to his lack of truthfulness. *See* FED. R. EVID. 609(a). The parties incorporated into their stipulation of facts that in June 1996, Gray pled guilty to federal bank fraud, and served 366 days in federal prison. (SOF ¶¶ 33-34.) His conviction arose out of a scheme to pledge forged stock certificates and forged proprietary leases as collateral for a bank loan. (SOF ¶ 32.) Ironically, he submitted forged documents to a bank but could not produce real records in Court. The stipulated facts

demonstrate that his crime involved a dishonest act, it is probative of his character for truthfulness, there was no unfairly prejudicial effect – this was a bench trial – and his crime was punishable by more than one year in prison (he served 366 days).  Finally, Gray stipulated to his conviction, and never contested its use at trial.

Accordingly, Gray failed to carry his burden of going forward with a justification for his failure to keep and preserve financial records.  He is akin to a cash business that maintains no records.  The money comes in from somewhere and goes out to somewhere but there is no way to tell how much Gray actually received, where it came from and where it went to.

Accordingly, the clerk of the court is directed to enter judgment denying the debtor a discharge.  The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a)(1) made applicable to this adversary proceeding by FED. R. BANKR. P. 7052.

So ordered.

Dated: New York, New York
       March 15, 2016

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge